RECEIVED - GR

July 1, 2015 2:15 PM
Tracey Cordes, CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: __ns__ /s/ 7/2/15

**Law Office of Barry W. Rorex, PLC**
177 N. Church, Suite 1100
Tucson, Arizona 85701
(520) 495-7596
(520) 838-8061 (fax)
Barry W. Rorex Bar No. 025910, PCC No. 66117
Michael Harnden Bar No. 029474, PCC No. 66532
barry@brorexlaw.com; mike@brorexlaw.com
Attorneys for Defendants Charles Rodrick and Web Express, LLC

**In the United States District Court**
**for the Western District of Michigan,**
**Southern Division**

| | |
|---|---|
| David William Nail, | Case No.: 1:15-cv-00177-JTN-ESC |
| Plaintiff | |
| vs. | **Motion to Dismiss** |
| Autumn Schrauben, *et al.*, | Hon. Janet T. Neff |
| Defendants | Assigned to Magistrate Judge Hon. Ellen S. Carmody |

Defendants Charles Rodrick and Web Express, LLC (captioned in the Complaint as "Web Express, L.L.C.") (hereafter, "Defendants"), by and through the undersigned counsel, pursuant to Fed. R. Civ. P.[1] 12(b)(2) and 12(b)(6), move this Court for an order dismissing Plaintiff's Complaint (Doc. 1) against Defendants because 1) any exercise of jurisdiction by this Court over Defendants is improper, 2) the Complaint fails to articulate any cognizable claim against either Defendant, and 3) Plaintiff has failed to plead the necessary elements of the causes of action he asserts. The Complaint should be dismissed against Defendants in its entirety and with prejudice.

This Motion is supported by the incorporated Memorandum of Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   Legal Standards

### A.   Rule 12(b)(2)

#### 1.   *Procedure*

"As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." *Serras v. First Tennessee Bank Nat. Ass'n*, 875 F.2d 1212,

---

[1] Hereafter, the Fed. R. Civ. P. will be referred to simply as "Rule ___".

1214 (6th Cir. 1989) (citing *Gibbs v. Buck*, 307 U.S. 66, 71–72 (1939)).  The Sixth Circuit has followed the *Serras* decision and permits a defendant to submit an affidavit alleging facts that would defeat the court's personal jurisdiction.  *See, e.g., Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

### 2. *Constitutional considerations*

As this case alleges federal Constitutional and due process claims, this Court has subject matter jurisdiction over the federal questions.  In such cases, this Court can only have personal jurisdiction over Defendants if the exercise of personal jurisdiction would not deny the Defendants due process and if they are amenable to service of process under Michigan's long-arm statute. *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 477 (6th Cir. 2003).  Before a court can evaluate a Michigan plaintiff's claim that the state's long-arm statutes apply, that court must consider whether assuming jurisdiction over a nonresident defendant would violate Constitutional due process considerations. *Theunissen*, 935 F.2d at 1459.  Such a violation, if found, forecloses the exercise of personal jurisdiction.  This evaluation is guided by three separate criteria:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.* at 1459-60.  A plaintiff's burden includes showing that each defendant's personal contacts with the forum state are sufficient to satisfy the "traditional notions of fair play and substantial justice". *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).  The purposeful availment requirement ensures that a defendant will not be "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party or third person", including a plaintiff. *Air Products & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551 (6th Cir. 2007) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (internal quotations omitted).  Jurisdiction is only proper where the contacts that create a substantial connection with the forum state proximately result from actions by the defendant himself. *Id.*  The absence of sufficient evidence showing purposeful availment is fatal to a court

exercising limited jurisdiction over an out of state defendant. *Roberts v. Paulin*, 07-CV-13207, 2007 WL 3203969 at *6 (E.D. Mich. Oct. 31, 2007). This is true whether the defendant is an individual or a corporation. *See Id.*

### a. Jurisdiction based on a website

The mere creation of a website that is accessible in Michigan due to the website's general availability on the internet "falls short of purposeful availment" necessary to establish limited jurisdiction in Michigan. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 890 (6th Cir. 2002). Circuit Courts across the country reject this broad application of personal jurisdiction to the internet:

> If we were to conclude as a general principle that a person's act of placing information on the Internet subjects that person to personal jurisdiction in each State in which the information is accessed, then the defense of personal jurisdiction, in the sense that a State has geographically limited judicial power, would no longer exist. The person placing information on the Internet would be subject to personal jurisdiction in every State . . . if that broad interpretation of minimum contacts were adopted, State jurisdiction over persons would be universal, and notions of limited State sovereignty and personal jurisdiction would be eviscerated.

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002).

In the Sixth Circuit, the operation of a website can serve as a basis for limited jurisdiction only "if the website is interactive to a degree that reveals specifically intended interaction with residents of the state." *Bridgeport Music*, 327 F.3d at 483. "A passive website that does little more than make information available to those who are interested in it is not grounds for the exercise personal jurisdiction." *Roberts*, 2007 WL 3203969 at *6 (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D.Pa.1997)).

When considering the application of statements regarding a person found on a website, the predecessor court in the Sixth Circuit's *Jones* decision "agree[d] with the perceptive discussion of the internet and personal jurisdiction" as set forth in *Facebook, Inc. v. ConnectU LLC* (C 07-01389 RS, 2007 WL 2326090 (N.D. Cal. Aug. 13, 2007)). *See Jones v. Dirty World Entm't Recordings, LLC*, 766 F. Supp. 2d 828, 834 (E.D. Ky. 2011). The District Court in *Jones* found that personal jurisdiction can be appropriate in the limited circumstance where the posting of the information on the website at

issue was "specific, targeted conduct" and was "expressly aimed at a particular individual or entity". *Id.* (internal quotation and citation omitted). Alleged injury to a forum resident, standing alone, is not enough. *Lifestyle Lift Holding Co., Inc. v. Prendiville*, 768 F. Supp. 2d 929, 937 (E.D. Mich. 2011).

### 3. Michigan's long-arm statutes

Personal jurisdiction is either general jurisdiction, where a defendant has "systematic and continuous" contact with the Michigan, or limited jurisdiction, also known as specific jurisdiction, where the subject matter of the lawsuit is related to a defendant's contacts with Michigan. *State Farm Mut. Auto. Ins. Co. v. Carter*, 1:08-CV-404, 2008 WL 5740100 at *4 (W.D. Mich. Oct. 28, 2008). The burden of establishing personal jurisdiction is solely plaintiff's. *Air Products*, 503 F.3d at 549. Personal jurisdiction must be analyzed and established over each defendant independently. *Days Inn Worldwide, Inc. v. Patel*, 445 F.3d 899, 903 (6th Cir. 2006) (citation omitted). A plaintiff attempting to establish jurisdiction must satisfy a two-pronged test: the due process requirements of the Constitution must be met and the defendant must be amenable to suit under the forum state's long-arm statute. *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir. 1994).

### 4. Nonresident corporations

Michigan's long-arm statute related to corporations extends "general" jurisdiction pursuant to Mich. Comp. Laws § 600.711 and "limited" jurisdiction pursuant to Mich. Comp. Laws § 600.715. *Neogen Corp.*, 282 F.3d 888. For a Michigan Court to have general personal jurisdiction over a corporation, that corporation must 1) be incorporated under Michigan law; 2) consent to jurisdiction in Michigan; or 3) must carry on "a continuous and systematic part of its general business" within Michigan. Mich. Comp. Laws § 600.711. When general jurisdiction exists, a court in Michigan may exercise jurisdiction over a corporation regardless of whether the claim at issue is related to the corporation's activities in the state or whether the claim at issue has an in-state effect. *Id.* (citation omitted).

Mich. Comp. Laws § 600.715 limits the relationships that give rise to limited personal jurisdiction over a nonresident corporation. Limited jurisdiction extends only to claims arising from the defendant's activities that were either within Michigan or had an in-state effect. *Neogen Corp*, 282 F.3d at 888 (citation omitted).

4

*5. Nonresident citizens*

For a Michigan court to have general personal jurisdiction over an individual, that person must 1) be physically located in Michigan at the time of service; 2) domicile in Michigan at the time of service; or 3) consent to jurisdiction in Michigan. Mich. Comp. Laws § 600.701.

The relationships that can give rise to limited personal jurisdiction over an individual in Michigan include all of those related to nonresident corporations as well as any person who is an officer of a Michigan corporation or any person who maintains a domicile in Michigan that serves as a basis for a marital claim. Mich. Comp. Laws § 600.705.

## B.  Rule 12(b)(6)

Rule 12(b)(6) requires the Plaintiff to allege facts which, if true, would provide adequate grounds for relief; "formulaic recitation of the elements of a cause of action" will not suffice. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 570). This Court "need not indulge in unreasonable inferences" in deciding whether a claim is stated. *HMS Prop. Mgmt. Group, Inc. v. Miller*, 69 F.3d 537 (6th Cir. 1995) (citation omitted).

Likewise, a complaint does not suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 557; *Iqbal*, 556 U.S. at 678. A plaintiff cannot meet his burden simply by contending that he "might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly*, 550 U.S. at 561. It is not sufficient if the complaint merely establishes a "sheer possibility" that the defendant has acted unlawfully. *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

To determine whether a complaint states a plausible claim for relief, the court must rely on its "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "The court need not accept as

true legal conclusions or unwarranted factual inferences." *Roller v. Litton Loan Servicing*, 10-13847, 2011 WL 2490597 at *6 (E.D. Mich. June 21, 2011). A complaint that contains materially contradictory facts will fail on the pleadings. *Id.*; *see also Robertson v. DLJ Mortgage Capital, Inc.*, No. CV–12–8033–PCT–LOA, 2012 WL 4840033 (D. Ariz. Oct. 11, 2012) ("Where a plaintiff's own allegations are contradicted by other matters asserted, relied upon, or incorporated by reference by that plaintiff in the complaint, the district court is not obligated to accept the allegation as true in deciding a motion to dismiss.") (citations omitted). Where there is an "obvious alternative explanation" for the conduct alleged, the complaint should be dismissed for failure to state a claim. *Iqbal*, 556 U.S. at 682.

## C.    § 1983 claims

Although not specifically cited, it is clear from context that Plaintiff's Constitutional claims are based on 42 U.S.C. § 1983. The standards for such a claim are well established in American jurisprudence:

> To state a claim for relief in an action brought under § 1983, [a party] must establish that [it was] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law. Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful.

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) (quotations and citations omitted). For an action to qualify as "state action", the party asserting the claim is required to prove "<u>both</u> an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible <u>and</u> that the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* (emphasis in original) (quotations and citations omitted). When evaluating the "state actor" requirement, a court must first identify "the specific conduct of which the plaintiff complains." *Id.* at 51. "Action taken by private entities with the mere approval or acquiescence of the State is not state action." *Id.* at 52.

///

The only way the actions of a private entity can be considered to constitute "state action" is when "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quotations omitted). The Sixth Circuit recognizes three tests when evaluating a claim of state action: 1) the public function test; 2) the symbiotic relationship or nexus test; and 3) the state compulsion test. *Lindsey v. Detroit Entm't, LLC*, 484 F.3d 824, 828 (6th Cir. 2007) (citing *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003)).

"Under the public function test, a private party is deemed a state actor if he or she exercised powers traditionally reserved exclusively to the state" but this test is interpreted very narrowly. *Chapman*, 319 F.3d at 833. The fact that a private action has a governmental analogue is not sufficient to prove state action. *Id.* at 834 (stating a private security officer may investigate a crime without transforming its actions into state action).

"Under the symbiotic or nexus test, a section 1983 claimant must demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself." *Id.* This inquiry is fact-specific and every finding is determined on a case by case basis. *Id.* Determining the presence of a nexus depends on whether the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Am. Mfrs.*, 526 U.S. at 52.

An action is determined to be state action under the state compulsion test only when the act is compelled by a statutory provision or by a custom having the force of law. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 170 (1970) ("When the State has commanded a particular result, it has saved to itself the power to determine that result and thereby 'to a significant extent' has 'become involved' in it.").

## II. <u>Argument</u>

Even if this Court were to find jurisdiction over Defendants and that Plaintiff adequately pleaded his causes of action (which are both disputed and argued in §§ II(C)-(E), *infra*), the Complaint must be dismissed because both Mr. Rodrick and Web Express, LLC are immune from

liability, regardless of how Plaintiff pleads his claims. These immunities are created both by the Communications Decency Act (the "CDA") and the 1st Amendment to the United States Constitution.

**A.      All of the claims contained in the Complaint are barred by the "safe harbor" provision of the Communications Decency Act.**

Section 230 of the CDA immunizes providers of interactive computer services against liability arising from content created by third parties: "'No provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.'" *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 406 (6th Cir. 2014) (citing 47 U.S.C. § 230(c)). Important for any analysis under the CDA are two terms: 1) a provider of an interactive computer service ("ICS") and 2) an information content provider ("ICP"). An ICS is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server . . . ." *Levitt v. Yelp! Inc.*, C-10-1321 EMC, 2011 WL 5079526 at \*6 (N.D. Cal. Oct. 26, 2011) *aff'd*, 765 F.3d 1123 (9th Cir. 2014) (citing 47 U.S.C. § 230(f)(3)). An ICP is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet . . . ." *Id.*

While the actual definitions may seem confusing or similar, how those definitions are applied is a vital distinction: an ICS is generally immune from any liability for publishing or transmitting any information that was provided primarily by third parties, whereas an ICP (or an ICS acting as an ICP with regard to that information) is not. "Section 230 marks a departure from the common-law rule that allocates liability to publishers or distributors of tortious material written or prepared by others. Absent § 230, a person who published or distributed speech over the Internet could be held liable for defamation even if he or she was not the author of the defamatory text, and, indeed, at least with regard to publishers, even if unaware of the statement." *Jones*, 755 F.3d at 407 (citing *Batzel v. Smith*, 333 F.3d 1018, 1026–27 (9th Cir. 2003)) (internal quotation omitted). Section 230 bars both claims that could otherwise be based on publisher-liability or distributor-liability. *Jones*, 755 F.3d at 407.

CDA immunity does not apply to the <u>creation</u> of content by a website.

8

> A website operator can simultaneously act as both a service provider and a content provider. If a website displays content that is created entirely by third parties, then it is only a service provider with respect to that content—and thus is immune from claims predicated on that content. But if a website operator is in part responsible for the creation or development of content, then it is an information content provider as to that content—and is not immune from claims predicated on it.

*Id.* at 408 (citing *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)). Because a website operator can be both a service provider and a content provider, it may be immune from liability for some of the content it displays to the public but be subject to liability for other content. *Id.* (citing *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc)). Even if an entity is determined to be an ICP, the CDA immunity extends to "any information provided by another information content provider . . . ." *Carafano*, 339 F.3d at 1125 (emphasis in original). Additionally, the CDA bars any lawsuit that attempts to hold an ICS liable for that ICS exercising "traditional editorial functions" over information or content provided by someone other than the ICS. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009), *as amended* (Sept. 28, 2009). These "traditional" functions include "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Klayman v. Zuckerberg*, 910 F. Supp. 2d 314, 319 (D.D.C. 2012) (citing *Barnes*) *aff'd*, 753 F.3d 1354 (D.C. Cir. 2014). Even altering the content provided by a third party before publishing it does not remove immunity under the CDA, if it is done with editorial, organizational, or effectiveness concerns. *Klayman*, 910 F. Supp. 2d at 319 (citing *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

If an entity is found to have immunity under the CDA, it is immune from nearly all civil liability, including civil extortion, intentional infliction of emotional distress, negligence, invasion of privacy, and defamation. See *Levitt*, 2011 WL 5079526 at *6 (civil extortion); *Kimzey v. Yelp, Inc.*, 21 F. Supp. 3d 1120, 1122-23 (W.D. Wash 2014) (RICO); *Carafano*, 339 F.3d at 1122 (invasion of privacy, negligence, defamation); *Barnes*, 570 F.3d at 1102 (intentional infliction of emotional distress).

The Sixth Circuit relies heavily on the Ninth Circuit's jurisprudence regarding the CDA and how that immunity applies. *See Jones*, 755 F.3d at 409-11. The Ninth Circuit has interpreted the

CDA to provide a "'robust' immunity for internet service providers and websites" and has adopted "a relatively expansive definition of 'interactive computer service' and a relatively restrictive definition of 'information content provider.'" *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) (citation omitted). "A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content." *Kimzey*, 21 F. Supp. 3d at 1123. A party "develops" the content displayed on a website (and the immunity therefore would not apply) only when that party has made a "material contribution" to that content, defined in this Circuit by the following: "[a] material contribution to the alleged illegality of the content does not mean merely taking action that is necessary to the display of allegedly illegal content. Rather, it means being responsible for what makes the displayed content allegedly unlawful." *Jones*, 755 F.3d at 410. Generally, a "website operator does not become liable as an information content provider merely by augmenting the content [of online material]". *Goddard*, 640 F. Supp. 2d at 1196 (interior quotations omitted) (brackets in original) (citation omitted); *accord Kruska v. Perverted Justice Found. Inc.*, CV08-0054-PHX-SMM, 2008 WL 2705377 at *2 (D. Ariz. July 9, 2008) (CDA immunity "protects more than the mere repetition of data obtained from another source, but extends to the provider's inherent decisions about" how it uses that information) (plaintiff with sex-related conviction's claims related to internet publication of statements related to that conviction dismissed as barred by the CDA safe harbor). However, the CDA does not immunize an ICS-eligible website with respect to any information that the website operator created entirely by itself. *Anthony v. Yahoo Inc.*, 421 F. Supp. 2d 1257, 1263 (N.D. Cal. 2006). Put in more plain language, "[e]ssentially, the CDA protects website operators from liability as publishers, but not from liability as authors." *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 07-956-PHX-FJM, 2007 WL 2949002 at *3 (D. Ariz. Oct. 10, 2007).

The Complaint states plainly that all of the content serving as the basis for each of its claims originated from a party other than one of the Defendants. *See, e.g.*, Compl. ¶ 9 (the information was posted "by Brent Meyers from the IDOC"); ¶ 10 (the information was posted by "Brent Meyers of the IDOC to ISSOR" and the information was allegedly "reposted" by one of the Defendants or

10

some other party); ¶ 31 (it was Defendant Adams that caused Plaintiff's name to be posted on multiple websites, including those allegedly related to the Defendants). The Complaint asserts that Plaintiff's information was "posted" on one or more websites that are allegedly related to the Defendants, but there are no allegations that either Defendant "created" or "developed" any of the information that was posted.

The Complaint contains no facts or statements that would remove CDA immunity from the actions alleged against Mr. Rodrick and/or Web Express, LLC related to the presence or absence of information on one or more websites. While the Complaint is less than explicit about the true location of the source of the information that was allegedly posted or which website(s) is/are at issue, the Complaint does make clear that all of the information originated from third parties. The only action(s) alleged against Defendants relates to Plaintiff's inability to force Defendants to remove the information provided by that third party. The truth (or lack thereof) of that information, the permission (or lack thereof) to repost that information from those other sources, and the alleged harm (or lack thereof) that Defendants alleged reposting caused are all irrelevant. A website operator is under no legal obligation to remove false or otherwise unlawful content when that content originated from a third party. *Global Royalties, Ltd.*, 2007 WL 2949002 at *3 (refusing to defeat CDA immunity and rejecting the argument that the website operator defendant "adopted" a third party's unlawful statements when the operator refused to remove the statements after the third party disavowed the statements and requested their removal from the web site). "It is well established that notice of the unlawful nature of the [content] provided is not enough to make it the [website operator's] own speech." *Id.* (brackets in original) (internal quotation omitted). If the original source of the information is a third party, the CDA bars claims against the operator for posting, publishing, or distributing that information. *Kruska*, 2008 WL 2705377 at *2 ("Congress made a policy choice, however, not to deter harmful online speech through the separate route of imposing tort liability on companies [or individual website operators] that serve as intermediaries for other parties' potentially injurious messages.")

///

///

11

Using the definitions of the CDA and the actions alleged in the Complaint, the Defendants are immune from liability under 47 U.S.C. § 230(c) and the Complaint must be dismissed with prejudice.

**B.    The First Amendment provides Defendants immunity as all of the information allegedly published reflects matters of public interest.**

In cases raising First Amendment issues, courts have an obligation to make an independent examination of the whole record in order to make sure any judgment arising from those cases would not constitute a forbidden intrusion on the field of free expression. *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 596 (6th Cir. 2013)

*1.    Cox Broadcasting and its progeny*

Before any evaluation of the information allegedly at issue can occur, it is important to clarify the governing law concerning publishing or republishing publically-extant information as a basis for liability. The U.S. Supreme Court in *Cox Broad. Corp. v. Cohn* (420 U.S. 469 (1975)) addressed head-on the conflict between the reporting and publication of public records in relation to the (sometimes incredibly) private and sensitive nature of the information contained in those records.

The main issue in *Cox*, without getting into the salacious details, was a "face-off" between a plaintiff who claimed "the right to be free from unwanted publicity about his private affairs, which, although wholly true, would be offensive to a person of ordinary sensibilities" and "the constitutional freedoms of speech and press". *Id.* at 489. The Court went into substantial detail discussing the substantial nature of privacy considerations, but eventually held "[o]nce true information is disclosed" in public records, civil liability for publication of that information is barred by the First Amendment. *Id.* at 496-497. In reaching this conclusion, the Court, relied, in part, on the RESTATEMENT (SECOND) OF TORTS which states, in relation to a privacy claim "[t]here is no liability when the defendant merely gives further publicity to information about the plaintiff which is already public." *Id.* at 494 (citing RESTATEMENT (SECOND) OF TORTS, § 652D, comment c). The Court also stated that the mere act of putting information into the public record means that information is *de facto* in the public's interest and that there is a public benefit by an entity relaying

the contents of those records to the public. *Cox Broadcasting*, 420 U.S. at 495. Because of the public interest in their contents, all public records are "newsworthy" for the purposes of First Amendment analysis and the mere passage of time, even more than a decade, between an event and a publication about that event, does not diminish the "newsworthiness" of the event. *See, e.g., Gates v. Discovery Communications, Inc.*, 101 P.3d 552 (Cal. 2004).

Since *Cox Broadcasting*, state and federal courts across the country have used its holdings and rationale to bar tort claims related to public information. *See Doe v. City of New York*, 15 F.3d 264, 268 (2d Cir. 1994) ("Certainly, there is no question that an individual cannot expect to have a constitutionally protected privacy interest in matters of public record."); *Palmer v. Savona*, CV-10-08209-PCT-JAT, 2013 WL 4478945 at *10 (D. Ariz. Aug. 21, 2013) ("Arizona favors an open government and informed citizenry and records in all courts . . . are presumed to be open to any member of the public . . . Despite Plaintiff's arguments to the contrary, official court records open to public inspection cannot support an action for invasion of privacy.") (internal citation and quotation omitted, first ellipses in original).

    2.   *Public records*

        a.   <u>Public's right to public records</u>

While Plaintiff does not explicitly identify the actual statement or information at issue, Defendants interpret the statement as an entry of Plaintiff's information into a sex offender registry for the state of Indiana. *See* Compl., ¶ 2. As the state is a public entity, any publication it creates is presumptively a matter of public record. This means that any member of the public has a lawful right to obtain this information: "[i]n addition to a constitutional right of access to criminal trials, the courts of this country recognize a general right to inspect and copy public records and documents . . . ." *Phoenix Newspapers, Inc. v. U.S. Dist. Court for Dist. of Arizona*, 156 F.3d 940, 946 (9th Cir. 1998) (quotation omitted). "The general public has the same right of access [to public and court records] as does the media." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 788 (9th Cir. 2014).

        b.   <u>Relevant public records</u>

"A public record, strictly speaking, is one made by a public officer in pursuance of a duty, the immediate purpose of which is to disseminate information to the public, or to serve as a

memorial of official transactions for public reference." *See Mathews v. Pyle*, 251 P.2d 893, 895 (Ariz. 1952) (citations omitted). It is "undisputed" that judgments (including records of convictions) are public records. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 412 (6th Cir. 2006) (arrest warrants and indictments are public records); *accord United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005) (analysis of a prior conviction in the public records hearsay exemption context).

One who is in possession of a public record may republish that record or the information contained therein, without consequence at law:

> Fair reports of what is shown on public records may be circulated freely and without liability. In the field of criminal law records of indictments, arrests, and arraignments are constantly reported without liability, and this even though any particular case may be later dismissed or a judgment of acquittal entered . . . Certainly there is no general public policy which prevents disclosure of the record of arrests, indictments, or convictions.

*Fite v. Retail Credit Co.*, 386 F. Supp. 1045, 1046 (D. Mont. 1975) *aff'd*, 537 F.2d 384 (9th Cir. 1976) (internal citation and notation omitted) (holding a credit reporting agency faces no liability for reporting a conviction that was later set aside and stating that even if a conviction is later set aside: "[i]t is sheer fiction to say that the conviction [itself] is 'wiped out' or 'expunged.'"). Those records relating to convictions which have been expunged or otherwise invalidated remain freely accessible to the public. *Harbert v. Priebe*, 466 F. Supp. 2d 1214, 1216 (N.D. Cal. 2006) (citing *People v. Field*, 37 Cal. Rptr. 2d 803, 808 (Cal. App. 1995)).

### 3.    First Amendment immunity

Plaintiff's attempt to use common law torts to silence unfavorable information also runs afoul of significant First Amendment considerations. "[N]o cause of action will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it." *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001). A "matter of public interest" for First Amendment analysis, is any "topic of widespread, public interest." *Doe v. Gangland Productions, Inc.*, 730 F.3d 946, 955 (9th Cir. 2013). The First Amendment acts as a shield, granting immunity to "almost all reporting of recent events" and to publications

about "people who, by their . . . mode of living . . . create a legitimate and widespread attention to their activities." *Downing*, 265 F.3d at 1001.

This defense extends to more than topics, summaries, or statements. The First Amendment protects publications regarding specific individuals who, because of what they have done, "create a legitimate and widespread attention to their activities." *Yeager v. Cingular Wireless LLC*, 673 F. Supp. 2d 1089, 1096 (E.D. Cal. 2009). While this protection is typically applied to publications regarding celebrities, no case has held and no logical argument can support the position that information could not be shared regarding a previously un-famous person who voluntarily performed an action that created a legitimate, widespread interest in their activities. A person who commits a crime, the nature of which the public is especially sensitive towards, makes themselves "newsworthy" for the purposes of First Amendment analysis and publications about that person cannot, absent other considerations, serve as the basis for liability. "[N]ewsworthiness is not limited to 'news' in the narrow sense of reports of current events. It extends also to the use of names, likenesses or facts in giving information to the public for purposes of education [] or enlightenment, when the public may reasonably be expected to have a legitimate interest in what is published. *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1089 (9th Cir. 2002) (brackets in original).

That information related to individuals involved in sex-related crimes and publication to the community of those people living nearby is a matter of public interest that has been recognized across the United States, including the enactment of 42 U.S.C. § 14071 which conditioned certain federal funding on each state adopting a "Megan's Law" requiring some form of sex-offender registration and notice to the community. State and federal courts across the country have affirmed the validity and importance of this interest. *See, e.g., Fredenburg v. City of Fremont*, 14 Cal. Rptr. 3d 437, 439 (Cal. App. 2004) ("The [California] Legislature further found that the public had a compelling and necessary . . . interest in obtaining information about released sex offenders . . . and [b]ecause of the public's interest in public safety, released sex offenders have a reduced expectation of privacy. . . .") (internal quotations and citation omitted).

Information related to the crimes and connections can be found in public records and therefore is "newsworthy" and subject to free distribution and/or publication without liability. *Fite*,

15

386 F. Supp. at 1046. When the information is of a type that the public is interested in or concerned about, that information is "newsworthy" and has no protectable privacy interest even if publishing that information could potentially jeopardize the safety of the subject of that information. *Ross v. Burns*, 612 F.2d 271, 272 (6th Cir. 1980) (dismissing claim related to a newspaper's publishing of photographs of an undercover narcotics officer, even if the publication jeopardized the officer's safety and efficacy); *see also Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136, 1145 (S.D. Cal. 2005) (dismissal of claims among allegations that the subject's lives had been endangered and their wives had received threatening phone calls as a result of the publications). The fact that a convict has, since punishment, led "an obscure, productive, lawful life" does not render a report of the conviction or surrounding details no longer newsworthy. *See, e.g., Gates v. Discovery Communications, Inc.*, 101 P.3d 552, 554 (Cal. 2004).

Whatever the underlying crime or reason, Plaintiff became "newsworthy" due to his commission of a crime. The fact that public records exist containing the details of those crimes creates First Amendment immunity for anyone who publishes that information. The Complaint's allegation that he is not required to register with an official "Megan's Law" website does not prevent the publication of the nature of his crimes. If "the gist, the sting, of the article is substantially true" a defendant is not liable for a publication that is not literally or absolutely accurate in every minute detail. *Hildebrant v. Meredith Corp.*, 63 F. Supp. 3d 732 (E.D. Mich. 2014) (citation omitted).

According to the allegations Plaintiff chose to include in the Complaint, all of the information allegedly posted to websites allegedly controlled by or related to the Defendants was already available from at least one source completely disconnected from any Defendant. It is not left to Plaintiff's discretion which or how many outlets publish the same information that is in the public interest. It is protected information and the First Amendment considerations and the public's right to this type of information bars any claim related to the dissemination of this information.

///

///

### C. Assuming personal jurisdiction over Defendants would deny due process.

Not only is there not a single allegation in the Complaint that could serve as a basis for this Court to have jurisdiction over either Defendant, but, as shown in the attached affidavit, Defendants have never taken or caused actions to occur in Michigan, have never purposefully availed themselves of any Michigan privilege, and the actions Plaintiff alleges were taken by Defendants have no connection to Michigan. An Affidavit in support of the portion of this motion related to Rule 12(b)(2) is attached hereto as Exhibit "A".[2]

Mr. Rodrick is an Arizona resident. Ex. A, ¶ 1. Web Express, LLC is an Arizona company. Ex. A, ¶ 2. All of the websites at issue, whether alleged to be related to Mr. Rodrick, Web Express, LLC, or wholly unrelated to either Defendant, are nonetheless hosted on computers physically located in Arizona and have their domain names registered by an Arizona-based company. Ex. A, ¶¶ 11-14.

While the websites at issue are presumably accessible from Michigan via the internet, they do not target Michigan or its residents, Defendants do not advertise directly to Michigan residents, and Defendants do not promote or seek business with Michigan residents. Ex. A, ¶¶ 9-10, 13. The websites archive public records gathered from all 50 states. Ex. A, ¶¶ 6-7. The archive is based on information released by as many as 200 governmental, nonprofit, or other third-party agencies. *See Id.* The information on the websites is provided to the public nationwide free of charge. Ex. A, ¶ 8. No goods or services are sold on the websites. Ex. A, ¶ 9.

There is no allegation that the appearance of Plaintiff's information on one or more websites allegedly related to Defendants was "specific, targeted" conduct or that the posting was "expressly aimed at" Plaintiff or any other person or entity in Michigan. *Cf.* Ex. A, ¶¶ 10, 13. Plaintiff's public record information was merely one entry in the over three quarter of a million entries in the websites at issue. Moreover, the information contained in the allegations of the

---

[2] "A District Court may consider outside matter attached to a motion to dismiss without first converting it into a motion for summary judgment if the material is pertinent to the question of the District Court's jurisdiction since it is always the obligation of a federal court to determine if it has jurisdiction." *State of Ala. ex rel. Baxley v. Woody,* 473 F.2d 10, 12 (5th Cir. 1973). The affidavits are not submitted in support of the portion of this Motion relating to Rule 12(b)(6), so no conversion of the motion into one for summary judgment is necessary.

Complaint supposedly relates to events or people occurring in Indiana, not Michigan. *See* Compl., ¶¶ 5, 10, 24, 31-32, 35, 38. The act of publishing Indiana public records over the internet has no connection to Michigan or Michigan's interests. Plaintiff merely residing in Michigan is too attenuated a contact for the state to have an interest in a separate state's public records regarding Plaintiff or any third party's actions relating to those public records. There is no allegation that any Defendant initiated contact with Plaintiff. Plaintiff is not prominently featured. His information is not present to "target" him. The website itself passively lists information that was collected from public records.

There is no basis for this Court to assume personal jurisdiction over either Defendant.

**D.     The private-party Defendants cannot, as a matter of law, deprive Plaintiff of any Constitutional right, including due process.**

At their most basic, Plaintiff's complaints against Defendants are limited to the publication of, and his attempts to remove, one or more records related to him created by the Indiana Department of Corrections. As an initial matter, Plaintiff has no protectable Constitutional right related to this information. "[w]e reiterate that not all rights of privacy or interests in nondisclosure of private information are of constitutional dimension, so as to require balancing government action against individual privacy." *Doe v. Michigan Dept. of State Police*, 490 F.3d 491, 500 (6th Cir. 2007) (quotation omitted) (rejecting a due process claim related to the publication of information regarding convictions for sex-related crimes). Additionally, making such information available does not constitute "punishment" under due process considerations: "[d]issemination of information about a person's criminal involvement has always held the potential for negative repercussions for those involved. However, public notification in and of itself, has never been regarded as punishment when done in furtherance of a legitimate government interest." *See Lanni v. Engler*, 994 F. Supp. 849, 854 (E.D. Mich. 1998). Michigan has rejected the claim that any publication of public records can constitute Constitutional harm to a person's reputation or privacy interests. *In re Wentworth*, 651 N.W.2d 773, 778 (Mich. App. 2002); *see also Akella v. Michigan Dept. of State Police*, 67 F. Supp. 2d 716, 731 (E.D. Mich. 1999) (rejecting plaintiffs' claim that their inability to challenge "incorrectly listed" information on an offender registry deprived them of due process).

18

Related to a more traditional due process analysis, the Complaint is devoid of any allegation which would support a claim that Mr. Rodrick or Web Express, LLC are governmental actors. Therefore, Plaintiff's accusations that Defendants (and other, unidentified parties) violated his "U.S. Constitutional substantive and procedural due process rights under the U.S. 14th Amendment" by creating a "post conviction [sic] penalty phase" and "illegal ex post facto punishment" must be grounded in § 1983. *See* Compl., ¶¶ 11, 19. Although the Complaint contains numerous conclusory statements insinuating the Defendants (and others) act as arms of the state or act with governmental power, there are no factual allegations sufficient to survive dismissal under any test that may allow a court to hold an act taken by a either Mr. Rodrick as a private individual or WebExpress, LLC as a private entity as "state action" for the purposes of § 1983 analysis.

### 1. *The public function test*

The websites at issue serve as an archive of public records. It is very likely that most, if not all, governmental organizations have an office, individual, or entire department dedicated to storing and collecting those public records produced by that governmental body. Some, but not all, governmental organizations have a method for a citizen to access such records electronically. While the websites at issue may duplicate the actions of one or more governmental organizations, the test only applies to "powers traditionally reserved <u>exclusively</u> to the state". *Chapman*, 319 F.3d at 833 (emphasis added).

Every citizen in America has the right to access and retain a copy of their government's public records. *Phoenix Newspapers*, 156 F.3d at 946. Private entities can collect and use public records in for-profit activities. On a regular basis, news organizations retrieve and display copies or portions of various public records. Law schools around the country are dependent on case books that include (often verbatim) judicial opinions and statutes, both public records. Private investigators rely on public records to find information about an individual. Large databases, such as LexisNexis, collect and combine a variety of information about individuals, including, but not limited to, public records identifying that person. While the websites at issue may duplicate one or

more governmental body's storing and displaying of public records, no plausible argument can be made that such a power is reserved <u>exclusively</u> to the government. The test fails.

### 2. *The symbiotic relationship or nexus test*

Put in simpler terms, the "nexus test" is met only if, regardless of the private nature of the entity, the action itself has the effect of being done by, is seen as being done by, or is seen as being done at the behest of, the state. There are no allegations in the Complaint that any governmental agency is involved in any of the websites at issue. There are no allegations that any governmental agency has exerted coercive power over, or provided any type of encouragement to, Defendants leading to the publication of information on the websites at issue. Other than an allegation indicating the information originated from a governmental agency or employee, there is not a single factual allegation suggesting there is any governmental tie to either Defendant or any of the websites at issue. Many states, including Michigan, have regulations related to the information contained within their sex offender registry. *See,* e.g., Mich. Comp. Laws § 28.730. However, the mere fact that a business may be subject to state regulation or that its business includes regulated materials or information does not by itself convert its action into that of the state for purposes of the Fourteenth Amendment. *See Jackson v. Metro. Edison Co.,* 419 U.S. 345, 350 (1974).

There is no relationship or nexus, this test fails.

### 3. *The state compulsion test*

Completely absent from the Complaint is there any allegation (direct or indirect) that the websites alleged to be related to Defendants were created as the result or any statute or governmental custom having the force of law. There are no alleged consequences either Defendant would face if they did not compile the information or publish that information on one or more of the websites at issue. The test fails.

### E. Plaintiff has failed to allege the necessary elements for each state law claims.

### 1. *Defamation*

In Michigan, the elements of claims related to "libel", "slander", and "defamation" are identical. *See Rockwell Med., Inc. v. Yocum,* 13-10480, 2014 WL 2965307 at *7 (E.D. Mich. June 26,

2014) (evaluating slander and libel claims under the same defamatory standard). A party alleging a claim for defamation in Michigan must plead four elements: 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication to a third party; 3) fault amounting to at least negligence on the part of the publisher; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication. *Rouch v. Enquirer & News of Battle Creek Michigan*, 487 N.W.2d 205, 210 (Mich. 1992).

Plaintiff has failed to allege any fact that could satisfy the second, third, and fourth elements of a defamation claim against either Defendant. Additionally, the Complaint does not include any information about when any supposed statement was made or assert any fact that would allow a defendant to identify where the statement was made. "[C]ountless district courts have found that the requirements of Rule 8 have not been met in cases where libel and slander claims failed to allege the substance of the statements and/or the time and place in which they were made." *Hawkins v. Kiely*, 250 F.R.D. 73, 75 (D. Me. 2008) (citing cases). This type of information is particularly important given defamation's strict statute of limitations in Michigan. *See Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005).

The Complaint fails to meet the pleading burden required under the Rules, and must be dismissed.

> 2. *Infliction of emotional distress*

Although the Complaint is not clear whether Plaintiff is alleging the intentional or negligent infliction of emotional distress, it is of no moment, because the claim fails under either cause of action.

> a. *Intentional infliction*

"The Michigan Supreme Court has never adopted the tort of intentional infliction of emotional distress into Michigan jurisprudence." *Cromer v. Safeco Ins. Co. of Am.*, No. 2:09-CV-13716, 2010 WL 1494469 at *5 (E.D. Mich. Apr. 14, 2010). As the state's highest court has repeatedly refused to acknowledge IIED as a valid cause of action in the state, the Complaint must be dismissed as to this claim.

///

### b. *Negligent infliction*

"[T]he Michigan Court of Appeals held that negligent infliction of emotional distress is a limited tort that is recognized where a person witnesses the negligent injury or death of a third person. It has not been extended to other situations." *Waeschle v. Oakland County Med. Exam'r*, 08-10393, 2008 WL 4792515 at *2 (E.D. Mich. Oct. 29, 2008) (quotation omitted).

The archetype of this tort is a negligent driver seriously injuring a bystander's family member directly in front of the plaintiff-bystander attempting to bring this claim, and the shock from seeing that injury causes serious harm to that person, even if they were not physically involved in the collision. The behaviors alleged in the Complaint do not satisfy the basis for bringing an NIED claim. The complaint alleges hypothetical emotional harm, but nothing that rises to the level of physical injury and consists completely of conclusory statements. The complaint contains no allegations of Plaintiff witnessing an injury to another. Plaintiff failed to assert a claim for NIED and no subsequent amendment could cure this defect because the actions and behaviors alleged cannot sustain such a claim. This claim must be dismissed with prejudice.

### 3. *Conspiracy*

The state of Michigan does not recognize "conspiracy" as an independent cause of action. "In Michigan, a conspiracy is a combination of two or more persons, by some concerted action, to accomplish a crime or unlawful purpose, or to accomplish a purpose not unlawful, but by crime and unlawful means" *Veriden v. McLeod*, 146 N.W. 6419 (Mich. 1914); *Fenestra v. Gulf American Land Corp.*, 141 N.W.2d 36 (Mich. 1966); *Studebaker Corp. v. Allied Products Corp.*, 256 F. Supp. 173, 182 (W.D. Mich. 1966). "The conspiracy standing alone without the commission of acts which cause damage would not be actionable. The cause of action does not result from the conspiracy but from the acts done." *Studebaker Corp. v. Allied Products Corp.*, 256 F. Supp. 173, 181, n. 3 (W.D. Mich. 1966) (citing *Roche v. Blair*, 9 N.W.2d 861, 863 (Mich. 1943)). The claim for "conspiracy" must be dismissed.

### 4. *Criminal endangerment*

No private right of action for "criminal endangerment" exists in Michigan. The phrase itself (let alone a holding validating it as a cause of action) does not appear in any Michigan state case nor

any opinion arising out from Michigan in the 6th Circuit. The phrase appears exactly once in Michigan statute, under the Michigan State Natural Resources and Environmental Protection Act. *See* Mich. Comp. Laws § 324.20139. Only two cases cite that statute, one dismisses a civil claim based, in part, on the statute and the other states the statute only "authorizes criminal prosecutions[.]" *Cairns v. City of E. Lansing*, 738 N.W.2d 246, 252 (Mich. App. 2007) (emphasis added). "Criminal endangerment" is not a recognized cause of action in Michigan and the claim must be dismissed.

## II.  Conclusion

As set forth in this Motion, all of Plaintiff's claims are subject to dismissal because they are barred by governing statute and case law, Plaintiff has failed to allege sufficient facts to plausibly state any claim for relief, or both. The Motion should be granted in its entirety and Plaintiff's claims against Defendants should be dismissed with prejudice.

RESPECTFULLY SUBMITTED this Tuesday, June 23, 2015.

/s/ Michael Harnden

Michael Harnden
Barry Rorex
Counsel for Defendants
Charles Rodrick and Web Express, LLC

**Certificate of Service**

I hereby certify that on June 23, 2015, I mailed the foregoing to the Clerk's office for filing at the following address:

Hon. Ellen S. Carmody
% Clerk's Office
399 Federal Bldg
110 Michigan St NW
Grand Rapids MI 49503

I further certify, pursuant to the agreement between the parties, that a copy of the foregoing was sent via email to Plaintiff.

/s/ Michael Harnden

Counsel for Defendants
Charles Rodrick and Web Express, LLC